1  McDONALD CARANO WILSON LLP                    *Electronically Filed July 22, 2014*
2  Ryan J. Works, Esq. (NV Bar No. 9224)
   Amanda M. Perach, Esq. (NV Bar No. 12399)
3  2300 West Sahara Avenue, Suite 1200
   Las Vegas, Nevada  89102
4  Telephone Number: (702) 873-4100
   Facsimile Number:  (702) 873-9966
5  rworks@mcdonaldcarano.com
   aperach@mcdonaldcarano.com
6  *Proposed Counsel for TEM Enterprises*

7

8                   **UNITED STATES BANKRUPTCY COURT**
                         **DISTRICT OF NEVADA**

9   In re                              Case No.: 14-13955-abl

10
    TEM ENTERPRISES,                   Chapter 11
11
           Debtor in Possession.      **OMNIBUS DECLARATION OF LISA DUNN**
12                                     **IN SUPPORT OF:**

13
                                       **MOTION FOR INTERIM APPROVAL OF**
14                                     **POST-PETITION FINANCING PURSUANT**
                                       **TO 11 U.S.C. § 364(c)(2) AND SETTING**
15                                     **FINAL HEARING FOR APPROVAL OF**
                                       **THE SAME**
16
                                       **AND**
17
                                       **MOTION FOR ORDER AUTHORIZING**
18                                     **DEBTOR IN POSSESSION TO: (A) REJECT**
                                       **THE AWAS AIRCRAFT LEASE**
19                                     **AGREEMENT; AND (B) ENTER INTO NEW**
                                       **AIRCRAFT LEASE AGREEMENTS**
20

21                                     **Hearing Date:**  *OST Requested*
                                       **Hearing Time:**  *OST Requested*
22

23                                     **Hearing Place: Foley Federal Building, 300**
                                       **Las Vegas Blvd. South, Las Vegas, Nevada**
24                                     **89101**

25

26  I, LISA DUNN, declare under penalty of perjury:

27         1.      I am the president of TEM ENTERPRISES d/b/a/ XTRA AIRWAYS ("Debtor"

28  or "Debtor in Possession"), debtor-in-possession in Case No. 14-13955-abl, pending in the

United States Bankruptcy Court, District of Nevada (the "Action").

2.     This declaration is made of my personal knowledge except where stated upon information and belief, and as to those matters I believe them to be true, and if called as a witness I could competently testify thereto.

3.     This declaration is submitted in support of the *Motion for Interim Approval of Post-Petition Financing Pursuant to 11 U.S.C. § 364(c)(2) and Setting Final Hearing for Approval of the Same* (the "DIP Financing Motion") and the *Motion for Order Authorizing the Debtor in Possession to: (A) Reject the AWAS Aircraft Lease Agreement; and (B) Enter into New Aircraft Lease Agreements* (the "Motion to Reject" and collectively, the "Motions"), filed concurrently herewith.

4.     Since the Petition Date, the Debtor has worked diligently to locate a prospective lender to provide it with debtor-in-possession financing ("DIP Financing") to continue operations and help fund reorganization of the Debtor.  On July 2, 2014, I, on behalf of the Debtor, and AerLine Holdings LLC ("AerLine" or "DIP Lender") entered into a Letter of Intent (the "LOI") whereby AerLine agreed, subject to this Court's approval, to provide $3,500,000.00 to the Debtor as exit financing, in exchange for 100% ownership in the reorganized Debtor.  A true and accurate copy of the LOI is attached hereto as "**Exhibit 1**".   As a showing of good faith, AerLine also agreed to deposit $500,000.00 into an escrow account which, it agreed, could be used as DIP Financing for the Debtor.  *Id.* at 2.

5.     On July 3, 2014, pursuant to the LOI, upon information and belief, AerLine deposited $500,000.00 into an escrow account.  AerLine and I, on behalf of the Debtor, have negotiated and propose entering into the attached DIP Loan Agreement, which provides, *inter alia*, for the use of up to $500,000.00 in funds prior to the confirmation of the Debtor's plan of reorganization.  A true and accurate copy of the proposed DIP Loan Agreement is attached hereto as "**Exhibit 2**."  The DIP Loan Agreement and its attendant exhibits are subject to final approval by the parties.

6.     The Debtor intends to utilize the $500,000 credit facility to satisfy the Debtor's secured claim (the "V31 Claim") held by V31-A&E LLC ("V31"), which has a blanket first-

priority lien on the Debtor's assets and received adequate protection liens under that certain *Stipulation and Agreed Order Authorizing Debtor To Use Cash Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363* [Docket No. 102] (the "Cash Collateral Order").  Upon information and belief, this claim is more than $240,000.00 which, if unpaid, will continue to grow as a result of continuing interest and V31's attorneys' fees and costs.  Over the course of the last three months, V31 asserts that it has incurred approximately $74,000.00 in pre-petition and post-petition legal fees, costs, and expenses associated with the V31 Claim.

7.      Moreover, the V31 Claim continues accruing interest at 15% since it went into default, pursuant to the terms and conditions of the operative loan documents.

8.      The remaining funds from the DIP Financing will be used for the general operations of the Debtor, consistent with the Debtor's revised budget.  The revised budget will include additional payroll expenses for pilots and staff necessary to increase the Debtor's charter operations.  In order to service the needs of the Debtor's growing customer base, the Debtor, subject to Court approval, will be leasing at least two more aircraft and hiring new pilots.  The proposed DIP Financing will also be used for certain reorganization expenses and continuing post-petition obligations.  A true and accurate copy of the proposed budget is attached hereto as "**Exhibit 3**."  The proposed budget provides for continued monthly adequate protection payments and protections for the Vx Entities, consistent with the terms and conditions of the Cash Collateral Order and budget attached thereto.

9.      Due to the Debtor's current financial situation and after talking with other interested parties, I believe that the terms set forth in the proposed DIP Loan Agreement are the most favorable terms available.  Upon information and belief, if the DIP Lender did not hope to purchase the Debtor, it would not likely have provided such terms to the Debtor.

10.     The Debtor does not believe alternative DIP Financing from other prospective lenders is available and has determined that a comparable arrangement is not likely available elsewhere.

11.     In particular, the agreement with V31 provides for an interest rate of 9% per

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 • FAX (702) 873-9966

annum and that rate jumps to 15% upon default. These terms were in place well before the bankruptcy filing. Upon information and belief, any loan obtained after the Petition Date would likely provide for an even greater interest rate due to the level of risk involved in financing a debtor in bankruptcy.

12.    The proposed DIP Loan Agreement sets forth an interest rate in the amount of 6% per annum (9% less than the current loan of V31, which is in default) with a mere 10% default rate of interest (5% less than the loan of V31). By comparison, it is clear that the terms of the DIP Loan Agreement are certainly competitive and favorable to the Debtor.

13.    Overall, the Debtor has sought out DIP Financing to ensure that it has sufficient working capital to consummate its forthcoming plan of reorganization and to terminate the growing V31 Claim. The DIP Financing proposed in the Motion should provide the Debtor with sufficient funds to reach its end goal of a successful reorganization. The Debtor expects to file its disclosure statement and plan within the next several weeks.

14.    The Debtor was able to obtain the proposed DIP Financing as a result of lengthy negotiations with the DIP Lender. The DIP Loan Agreement is the result of such negotiations and constitutes an arms-length transaction.

15.    The Debtor has been contacted by several interested parties during the course of its negotiations with AerLine; however, Debtor was unable to locate more favorable terms. In all, the Debtor believes the proposed terms are reasonable under the circumstances of this case. Importantly, if the proposed plan is confirmed, the $500,000.00 will be credited to the proposed exit financing of $3,500,000 and the Debtor will not be required to tender such payments back to AerLine.

16.    A true and accurate copy of the Pay-Off Letter, as defined by the DIP Financing Motion is attached hereto as "**Exhibit 4**." Upon information and belief, it is in the Debtor's best interest and in the best interest of the estate to satisfy the V31 Claim and to execute and deliver the Pay-Off Letter to V31.

17.    As of the Petition Date, Debtor was a party to a lease agreement (the "Lease") entered into by and between AWAS and the Debtor whereby the Debtor retained the rights to

McDONALD • CARANO • WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 • FAX (702) 873-9966

exclusively use and possess that certain aircraft owned by AWAS (the "Aircraft") in exchange for a monthly lease payment.  A true and accurate copy of the AWAS Lease is attached hereto as "**Exhibit 5**".

18.    The Debtor is also currently a party to a lease agreement with Triton Aviation California, Inc. ("Triton"); however, the Debtor has obtained Triton's consent to extend the deadline under 11 U.S.C. § 1110 in order for it to have additional time to reach its decision concerning the prospect of assuming (and curing the arrearages as required under 11 U.S.C. 1110(a)(2)) or rejecting that lease.

19.    As of the Petition Date, Debtor was in default of the Lease in the amount of approximately $1,439,755.93.

20.    Debtor is unable to cure the existing pre-petition default on the AWAS Aircraft Lease of approximately $1,439,755.93.

21.    As noted herein, in connection with preparing to exit from Chapter 11, Debtor has been negotiating a plan of reorganization with AerLine, a commercial aircraft holding company.

22.    AerLine and the Debtor agree that assumption of the existing AWAS Lease would place an undue financial burden on the Debtor considering the cure payment that would be required of the Debtor and, given its alternatives, assumption would not be in best interests of the estate.

23.    Debtor has given AWAS a "Notice of Termination of the Lease" and filed the same contemporaneously with the filing of its Motion to Reject and is in the process of surrendering possession of the Aircraft prior to the 11 U.S.C. §1110 deadline at which time AerSale, Inc. (an affiliate of AerLine) will purchase the AWAS Aircraft and lease it back to the Debtor.

24.    Upon information and belief, AerSale, Inc. has recently entered into a letter of intent for a purchase and sale agreement with AWAS to acquire the AWAS Aircraft, at which time AerSale, Inc. will lease the Aircraft back to the Debtor.

25.    AerLine has also offered to provide the Debtor with two new aircraft at

McDONALD · CARANO · WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 · LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 · FAX (702) 873-9966

1  substantially lower monthly lease payments than the Debtor's current lease agreements.  A true
2  and accurate copy of each of the proposed leases is attached hereto as "**Exhibit 6**".

3       26.    These lease payments are below market and will substantially benefit the Debtor
4  by reducing its operating costs.

5       27.    Upon information and belief, AerLine has four B737-400 high gross weight
6  aircraft for Debtor's potential use.  AerLine is offering to deliver these new aircraft with fresh
7  "C" checks, new leather interiors and fresh white paint and turn-key for Debtor's operations.
8  The "C" check is a major maintenance service performed on an aircraft approximately every
9  20–24 months or a specific amount of actual flight hours, or as defined by the manufacturer of
10 the aircraft. This maintenance check is much more extensive than a "B" Check, requiring a
11 large majority of the aircraft's components to be inspected from front to back.  A "C" check
12 puts the aircraft out of service and until it is completed, the aircraft must not leave the
13 maintenance site.  This process is expensive and takes weeks to complete.

14      28.    The new leases with AerLine's affiliates (the "<u>AerLine Leases</u>") would require
15 the Debtor to pay $50,000 per month in basic rent per airframe to AerLine's affiliate, AerSale,
16 Inc.  In addition, usage of engines, landing gear, and auxiliary power units ("<u>APU</u>") will be paid
17 on a reserve basis in advance, similar to the existing leases with other aircraft owners.  These
18 are at substantially competitive rates that will drastically reduce the operational expenses of the
19 Debtor.

20      29.    At present, Debtor pays significantly more to its current lessors.

21      30.    AerLine has also agreed to waive any requirement for security deposits so long
22 as the Chapter 11 reorganization continues proceeding forward.

23      31.    In the event that the negotiations fail, through no fault of AerLine, under the
24 proposed AerLine Leases, AerLine would have the right to cancel the leases and have the
25 aircraft returned to them in Roswell, New Mexico upon ten (10) days' written notice.  However,
26 the proposed AerLine Leases do provide Debtor with the right to extend its leases at market
27 rates, on a limited basis, in order to cover contracted ICE flights until replacement aircraft can
28 be found.  "ICE flights" refer to flights performed for the U.S. Immigration and Customs

Enforcement agency which contracts with the Debtor to provide flights for the re-exportation of illegal immigrants.

32.     The benefits of the AerLine Leases are numerous including: (1) the reduction in lease expense, (2) the newer condition of the replacement aircraft and (3) the waiver of the security deposits which are normally required by every lessor.  These changes provide a significant immediate economic benefit to the Debtor.

33.     Upon information and belief, the potential risk of termination of the AerLine Leases in the event Debtor seeks to terminate negotiations is minimal.  Any negotiations with a different purchaser would be conditioned on the requirement that the candidate provide similar replacement aircraft at the same or better terms.

34.     Thus, the AerLine Leases would serve as an effective stalking horse for lease terms, a situation that could provide further benefit to the Debtor.

35.     Because the existing AWAS Lease and proposed AerLine Leases contain proprietary information, such leases will be filed with the Court subject to a motion for filing such agreements under seal.

SIGNED under penalty of perjury this 22nd day of July, 2014.

By: /s/ Lisa Dunn
Lisa Dunn

McDONALD • CARANO • WILSON LLP
2300 WEST SAHARA AVENUE, SUITE 1200 • LAS VEGAS, NEVADA 89102
PHONE (702) 873-4100 • FAX (702) 873-9966

# EXHIBIT 1

# EXHIBIT 1



121 Alhambra Plaza | Suite 1700
Coral Gables, FL 33134
*Office:* +1(305) 764-3200
*Fax:* +1(305) 529-6686

July 2, 2014

*Via e-mail*
Ms. Lisa Dunn
President
TEM Enterprises, Inc. d/b/a Xtra Airways
805 West Idaho
Suite 400
Boise, Idaho 83702

RE:    Letter of Intent to Purchase Xtra Airways.

Dear Lisa:

Reference is made to *In re TEM Enterprises, Debtor in Possession*, Case No.: 14-13955-abl (the "**Bankruptcy Case**"), pending in the U.S. Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**"). Further to our recent discussions, Buyer (as defined below) is prepared to complete a transaction (the "**Transaction**") under the following basic terms and conditions set forth below in this letter of intent (this "**LOI**") subject to the final terms and conditions reflected in definitive transaction documents (the "**Transaction Agreements**") to be agreed between the parties hereto and approved by the Bankruptcy Court as necessary:

**Debtor:**          TEM Enterprises, Inc., a Nevada corporation, d/b/a Xtra Airways ("**Debtor**" or "**Xtra**")

**Buyer:**           AerLine Holdings LLC, a Delaware limited liability company, or its affiliate.

**The Purchase:**    For the Purchase Price (defined below), the purchase by Buyer of 100% of the newly issued shares of the reorganized Debtor, its assets, inventory, intellectual property rights, governmental licenses, and related rights, but excluding without limitation the pre-petition liabilities of Debtor and any cause of action, other than for any liability under a contract specifically designated by Buyer for assumption (the "**Purchase**"). Buyer intends to be flexible as to how to structure the Transaction so as to

**AerLine Holdings LLC**

achieve both the purchase and the exclusion of liabilities described immediately above, and understands the Transaction may only occur through a confirmed plan of reorganization ordering the cancellation of all current shares of Debtor's issued and outstanding capital stock (and/or any other securities, options or rights related thereto) and the issuance of new shares of the reorganized Debtor to Buyer, while providing Buyer as the new equity owner with the protections afforded under the United States Bankruptcy Code.

**Purchase Price:** The total purchase price for the Purchase is Three Million Five Hundred Thousand US Dollars ($3,500,000).

**Deposit:** Buyer shall deposit into escrow (pursuant to an escrow agreement with an escrow holder on terms acceptable to Buyer and Debtor) the sum of Five Hundred Thousand US Dollars ($500,000) (the "**Deposit**"), to be promptly refunded in the event that Buyer elects to terminate in writing this LOI or any further negotiations pursuant to this LOI before the Transaction Agreements are executed and delivered or pursuant to the Transaction Agreements after execution and delivery thereof due to (a) a Plan of Reorganization or sale acceptable to Buyer not having been approved by the Bankruptcy Court within 75 days of the date hereof, subject to such extension(s) as may be agreed by the parties in their sole discretion, (b) Debtor having ceased operations, (c) the US DOT or FAA having revoked or suspended any of Debtor's licenses or operating authorities, (d) the Transaction not having closed within 90 days of the date hereof, subject to such extension(s) as may be agreed by the parties in their sole discretion; or (e) other reasons set forth in the Transaction Agreements.

**DIP Loan:** Buyer will extend a Debtor in Possession (DIP") loan to Debtor on such terms as are acceptable to Buyer in its sole discretion, up to the amount of the $500,000 Deposit and including without limitation such super priority security as Buyer may require, in aid of a plan of reorganization involving Buyer's purchase of Debtor and confirmation of the same. The parties acknowledge that the DIP loan is subject to the approval of the Bankruptcy Court, and that, in the event that Debtor terminates the

AerLine Holdings LLC

Transaction to pursue another transaction with another buyer, Debtor shall require such other party to pay Buyer, and Buyer must receive, all amounts outstanding under Buyer's DIP loan in tandem with Debtor's termination of the Transaction.

*Due Diligence:*

The parties shall sign a customary mutual confidentiality and non-disclosure agreement to govern any exchange of information or documents between the parties prior to any obligation of either to provide access to such information or documents. During the Bankruptcy Case and prior to any eventual closing of the Transaction, Buyer will be allowed to conduct due diligence on Debtor, including without limitation on its leased aircraft, contracts, all assets (owned or leased by Debtor), its operations, personnel, books and records, ownership, and regulatory compliance and filings. Debtor shall keep Buyer informed of all material developments relating to its business, the matters above, and/or the Bankruptcy Case. Any and all work product created by Buyer and/or its representatives shall be and remain the sole property of Buyer, and Buyer shall not be obliged to provide the same to any other party.

*Closing Date*:

To be determined in consultation with Debtor but estimated to occur within fourteen (14) days of entry of an order by the Bankruptcy Court confirming Debtor's plan of reorganization and sale of assets. Buyer would have a right to terminate the Transaction if it shall not have closed within 90 days of the date hereof, subject to such extension(s) as may be agreed by the parties, and be entitled to full refund of the Deposit[, less any amounts released from the Deposit escrow and loaned to Debtor pursuant to the Bankruptcy Court approved DIP loan described above].

*Transaction Documentation*:

Buyer's counsel shall prepare drafts of Transaction Agreements promptly following execution of this LOI and payment of the Deposit by Buyer. Similarly, Debtor's counsel shall promptly prepare drafts of the plan of reorganization and disclosure statement reflecting the Transaction and such other matters as are normal for such documents and disclosure. Buyer shall have the right to approve the same prior to filing. The Transaction shall be

AerLine Holdings LLC

memorialized in definitive Transaction Agreements executed by Debtor and Buyer, on terms and conditions acceptable to each of Debtor and Buyer in their sole and absolute discretion. This LOI is intended to memorialize the preliminary understanding of Debtor and Buyer with respect to some of such terms and conditions, but the parties acknowledge that the Transaction Agreements will contain additional, customary terms and conditions not set forth in this LOI, that the terms and conditions set forth in this LOI are not the final expression of such definitive provisions, and that this LOI is non-binding upon the parties for any purpose, except for those provisions herein related to the Deposit or as may otherwise be specified herein. The parties agree to negotiate the Transaction Agreements in good faith, but either Debtor or Buyer may terminate all negotiations of the Transaction Agreements, including without limitation of any DIP Loan documents, at any time before the same have been executed and delivered by both parties, in their sole and absolute discretion, with no continuing obligations under this LOI except with respect to the return of the Deposit or as may otherwise be specified herein. The parties acknowledge that the Transaction and the Transaction Agreements are also subject to the approval of the Bankruptcy Court.

*Law:*

This LOI and the Transaction Agreements shall be governed by the laws of the State of New York applicable to contracts made and to be performed within such State without regard for principles of conflict of laws.

*Venue:*

Each party irrevocably consents to and submits itself exclusively to the jurisdiction of the Bankruptcy Court for so long as the Bankruptcy Court shall require retention of jurisdiction for the purpose of any suit, action or other judicial proceeding arising out of or connected with the performance of this LOI, the Transaction agreement, and all other documents and acts contemplated by each. The prevailing party in any suits, actions or other judicial proceedings shall be entitled to reimbursement of its reasonable attorneys' fees and expenses relating to such suits, actions or proceedings.

AerLine Holdings LLC

If this LOI correctly sets forth our mutual understanding, please indicate your acceptance by executing in the place provided below and returning to the undersigned by July 2, 2014.

Very truly yours,

AerLine Holdings LLC

Nicolas Finazzo
Member

*Agreed to and accepted by:*

TEM Enterprises, Inc.

Lisa Dunn
President

# EXHIBIT 2

# EXHIBIT 2

DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT,

Dated as of July ___, 2014

between

TEM ENTERPRISES, a Nevada corporation dba XTRA Airways

Debtor and Debtor in Possession under Chapter 11 of the Bankruptcy Code,

as Borrower,

and

AERLINE HOLDINGS LLC, a Delaware limited liability company,

as Lender

---

# TABLE OF CONTENTS

**Page**

RECITALS ..........................................................................................................................1

ARTICLE I DEFINITIONS .............................................................................................1

    1.1      Defined Terms. ...................................................................................1
    1.2      Other Definitional Provisions. ...........................................................7
    1.3      Payment Terms; References to Money. ..............................................7

ARTICLE II AMOUNT AND TERMS OF REVOLVING LOANS ...........................8

    2.1      Revolving Loan Commitments. ..........................................................8
    2.2      Revolving Note. ..................................................................................8
    2.3      Procedure for Revolving Loans and Payments. ................................8
    2.4      Permanent Reduction of Revolving Loan Commitment. ...................9
    2.5      Computation of Interest. .....................................................................9
    2.6      Prepayments. .....................................................................................10
    2.7      Use of Proceeds. ...............................................................................10
    2.8      Separate Loans Not To Exceed Commitment. ..................................10
    2.9      Nature of Obligations. ......................................................................11
    2.10    Payment of Obligations. ...................................................................11
    2.11    No Discharge; Survival of Claims. ..................................................11

ARTICLE III REPRESENTATIONS AND WARRANTIES ...................................11

    3.1      Corporate Existence; Compliance with Law. ..................................11
    3.2      Corporate Power, Authorization, Enforceable Obligations. ...........12
    3.3      No Legal Bar. ....................................................................................12
    3.4      No Material Litigation. .....................................................................12
    3.5      Taxes. ...............................................................................................12
    3.6      Purpose of Loans. .............................................................................13
    3.7      Accuracy and Completeness of Information. ...................................13
    3.8      The Interim Order. ............................................................................13
    3.9      Reorganization Matters. ...................................................................13

ARTICLE IV CONDITIONS PRECEDENT ..............................................................14

    4.1      Conditions to the Initial Loans Upon Entry of the Interim Order...........14
    4.2      Conditions to Additional Loans upon entry of the Final Order. ................15

ARTICLE V NEGATIVE COVENANTS .....................................................................15

    5.1      Limitation on Indebtedness. .............................................................15
    5.2      Limitation on Liens. .........................................................................16
    5.3      Limitation on Sale of Assets. ...........................................................16

ARTICLE VI TERMINATION .....................................................................................16

i

| | | |
|---|---|---|
| 6.1 | Termination. | 16 |
| 6.2 | Survival of Obligations Upon Termination of Financing Arrangements. | 16 |

ARTICLE VII EVENTS OF DEFAULT; RIGHTS AND REMEDIES ......................................17

| | | |
|---|---|---|
| 7.1 | Events of Default. | 17 |
| 7.2 | Remedies. | 19 |

ARTICLE VIII MISCELLANEOUS ........................................................................................19

| | | |
|---|---|---|
| 8.1 | Amendments and Waivers. | 19 |
| 8.2 | No Waiver; Cumulative Remedies. | 19 |
| 8.3 | Survival of Representations and Warranties. | 20 |
| 8.4 | Successors and Assigns; Participations and Assignments. | 20 |
| 8.5 | Counterparts. | 20 |
| 8.6 | Severability. | 20 |
| 8.7 | Governing Law. | 20 |
| 8.8 | Submission To Jurisdiction; Waivers.  Borrower and Lender | 21 |
| 8.9 | No Waiver. | 21 |
| 8.10 | Waiver of Claims. | 21 |

## **LIST OF EXHIBITS**

| EXHIBIT NO. | DESCRIPTION |
| --- | --- |
| A | Revolving Note |
| B | Security Agreement |

THIS DEBTOR-IN-POSSESSION REVOLVING CREDIT AGREEMENT, dated as of July ____, 2014 (this "<u>Agreement</u>"), between (i) TEM ENTERPRISES, a Nevada corporation dba XTRA AIRWAYS (the "<u>Borrower</u>"), a debtor and a debtor-in-possession in Case No. 14-13955-abl (the "<u>Chapter 11 Case</u>"), pending under Chapter 11 of Title 11 of the Bankruptcy Code (as defined in <u>Section 1.1</u>) in the United States Bankruptcy Court, District of Nevada, and (ii) AERLINE HOLDINGS LLC, a Delaware limited liability company (the "<u>Lender</u>").

RECITALS

WHEREAS, on June 4, 2014 (the "<u>Petition Date</u>"), the Borrower filed a voluntary petition with the Bankruptcy Court (as defined in <u>Section 1.1</u>) initiating the Chapter 11 Case and has continued in the possession of its assets and in the management of its business pursuant to Bankruptcy Code Sections 1107 and 1108;

WHEREAS, Borrower desires to fully satisfy the V31 Secured Loan Debt as defined in <u>Section 1.1</u>);

WHEREAS, an immediate and on-going need exists for the Borrower to obtain additional funds in order to continue the operation of its business as a debtor-in-possession under Chapter 11 of the Bankruptcy Code and, accordingly, the Borrower has requested that the Lender extend post-petition financing to the Borrower;

WHEREAS, the Lender is willing to make the Revolving Loan (as defined in <u>Section 1.1</u>) to the Borrower upon the terms and conditions set forth herein;

NOW, THEREFORE, in consideration of the premises and the mutual covenants hereinafter contained, and for other good and valuable consideration, Borrower and Lender hereby agree as follows:

ARTICLE I
DEFINITIONS

1.1    <u>Defined Terms</u>.

Capitalized terms used in the Loan Documents (as defined below) shall have (unless otherwise provided elsewhere in the Loan Documents) the following respective meanings and all Section references in the following definitions shall refer to Sections of this Agreement:

"<u>Affiliate</u>" shall mean, as to any Person, any other Person which, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person. For purposes of this definition, "control" of a Person shall mean the power, directly or indirectly, either (a) to vote 5.0% or more of the securities having ordinary voting power for the election of directors of such Person or (b) to direct or cause the direction of the management and policies of such Person, whether by contract or otherwise;

1

"Agreement" shall mean this Debtor-in-Possession Revolving Credit Agreement, as the same may from time to time be amended, modified or supplemented.

"Asset Sale" shall mean the disposition of all or substantially all of the Collateral or series of related dispositions of all or substantially all of the Collateral pursuant to the Final Order and Reorganization Plan.

"Bankruptcy Code" shall mean 11 U.S.C. §§ 101, et seq. as amended.

"Bankruptcy Court" shall mean the United States Bankruptcy Court for the District of Nevada.

"Bankruptcy Rules" shall mean the Federal Rules of Bankruptcy Procedure, as the same may from time to time be in effect and applicable to the Chapter 11 Case.

"Borrower" shall mean and refer to Tem Enterprises, a Nevada corporation dba Xtra Airways.

"Borrowing Availability" means, at any time, (a) the aggregate amount of the Maximum Commitment Amount at such time, *less* (b) the Carve-Out, *less* (c) the then Total Utilization of Revolving Loan Commitments.

"Business Day" shall mean a day other than a Saturday, Sunday or other day on which commercial banks in Nevada are authorized or required by law to close.

"Carve-Out" shall mean a portion of funds available to the Borrower under the Maximum Commitment Amount, the amount of which shall be determined at a later date, which may be used for payment of allowed professional claims pursuant to Bankruptcy Code sections 326, 328, 330 and/or 331.

"Chapter 11 Case" shall have the meaning ascribed thereto in the first paragraph of this Agreement.

"Change of Control" shall mean the occurrence of any of the following:

(a)    the acquisition directly or indirectly by any Person, or two or more Persons acting in concert (other than the Lenders) of (i) beneficial ownership (within the meaning of Rule 13d-3 of the Securities and Exchange Commission under the Securities Exchange Act of 1934) of thirty-five percent (35%) of the outstanding Voting Securities of the Parent or (ii) the power (whether or not exercised) to elect a majority of the Parent's directors;

(b)    Borrower's Chapter 11 Case shall be converted or dismissed.

"Change of Management" shall mean any circumstance in which Lisa Dunn is not acting in a management capacity for Borrower or its Affiliates.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and rulings issued thereunder.

2

"Collateral" shall mean the Existing Collateral as of the date of this Agreement, plus any additional personal property assets acquired by Borrower after the date of this Agreement in the ordinary course of business, and less any personal property assets of Borrower disposed of, sold, or otherwise transferred to any other Person after the date of this Agreement in the ordinary course of business.

"Commitment Termination Date" shall mean the earliest of (a) the Maturity Date, (b) the date that is thirty (30) days after entry of the Interim Order by the Bankruptcy Court if the Final Order has not been entered by the Bankruptcy Court prior to the expiration of such thirty (30) day period, (c) the date of substantial consummation (as defined in section 1101 of the Bankruptcy Code and which for purposes of this Agreement shall be no later than the effective date) of a Reorganization Plan that is confirmed pursuant to an order of the Bankruptcy Court, and (d) the acceleration of the Revolving Loans and the termination of the Revolving Loan Commitments in accordance with the terms hereof, including Section 7.2.

"Committees" shall mean collectively, the official committee of unsecured creditors and any other committee formed, appointed, or approved in the Chapter 11 Case and each of such Committees shall be referred to herein as a Committee.

"Default" shall mean any of the events specified in Section 7.1, whether or not any requirement for the giving of notice, the lapse of time, or both, or any other condition, has been satisfied.

"Deposit Account" shall mean a "deposit account" as defined in Section 9-102 of the Uniform Commercial Code as in effect from time to time in the State of Nevada.

"Dollars" or "$" shall mean lawful currency of the United States of America.

"Event of Default" shall have the meaning ascribed thereto in Section 7.1.

"Existing Collateral" shall mean the Debtor's assets as fully set forth in the Security Agreement, attached as Exhibit B.

"Final Closing Date" shall mean the date which is the date of entry of a final order approving of the Agreement.

"Final Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Court which order shall be satisfactory in form and substance to Lender, and from which no appeal or motion to reconsider has been timely filed, or if timely filed, such appeal or motion to reconsider has been dismissed or denied (unless Lender waives such requirement), together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur Indebtedness, and provides for a senior lien securing the Lender's claims.

"Fiscal Year" shall mean any of the annual accounting periods of the Borrower ending on December 31 of each year.

3

"Indebtedness" shall mean the amount of any consensual obligations, commitments, undertakings, or other indebtedness payable by Borrower (including principal and interest thereon) pursuant to any agreement entered into by Borrower with respect to the borrowing of money from any Person.

"Initial Budget" shall mean collectively the Borrower's operating budget, on a consolidated basis, for the 13-week period commencing on the Interim Closing Date, which operating budget includes, on a line item basis, projected weekly cash receipts and all expenditures, all on a consolidated basis, proposed to be made during such 13-week period, and incorporates, without double counting, the variances permitted pursuant to the Postpetition Financing Orders, which operating budget additionally shall be in form and substance acceptable to the Lender.

"Interest Payment Date" means the first Business Day of each month.

"Interim Closing Date" shall mean July __, 2014.

"Interim Order" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Case after an interim hearing (assuming satisfaction of the standards prescribed in section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other applicable law), together with all extensions, modifications, and amendments thereto, in form and substance satisfactory to Lender, which, among other matters but not by way of limitation, authorizes, on an interim basis, the Borrower to execute and perform under the terms of this Agreement.

"IRS" shall mean the Internal Revenue Service, or any successor thereto.

"Lender" shall have the meaning ascribed thereto in the first paragraph of this Agreement.

"Lien" shall mean (a) any mortgage, pledge, statutory deemed trust, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including, without limitation, any conditional sale or other title retention agreement and any financing lease having substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC (other than the filing of any such financing statement which states therein that such filing is a precautionary filing only and is filed in connection with "true leases" only) or comparable law of any jurisdiction), (b) any arrangement or agreement which prohibits any loan party from creating any mortgage, pledge, hypothecation, deposit arrangement, encumbrance, lien, charge or other security interest, or from entering into any agreement or arrangement described in clause (a) of this definition or (c) the sale, assignment, pledge or transfer for security of any accounts, general intangibles or chattel paper of any loan party with or without recourse.

"Litigation" shall have the meaning ascribed thereto in Section 3.4.

"Loans" shall mean the Revolving Loans.

4

"Loan Documents" shall mean this Agreement, the Revolving Note and all other agreements, instruments, documents and certificates executed and delivered to, or in favor of, Lender and including all other pledges, powers of attorney, consents, assignments, contracts, notices, and all other written matter whether heretofore, now or hereafter executed by or on behalf of Borrower in connection with the Agreement or the transactions contemplated hereby. Any reference in the Agreement or any other Loan Document to a Loan Document shall include all exhibits thereto, and all amendments, restatements, supplements or other modifications thereto, and shall refer to such Agreement as the same may be in effect at any and all times such reference becomes operative.

"Material Adverse Effect" shall mean a material adverse effect on (a) the business, operations, property or condition (financial or otherwise) of the Borrower, (b) the ability of Borrower to fully and timely perform its Obligations or (c) the validity, priority or enforceability of this Agreement, any of the Revolving Note or any of the other Loan Documents, or the rights or remedies of the Lenders hereunder or thereunder.

"Maturity Date" shall mean ___, 2015.

"Maximum Commitment Amount" shall mean $500,000.00.

"Note" shall mean the Revolving Note.

"Notice of Revolving Loan" shall have the meaning ascribed thereto in Section 2.3.

"Obligations" shall mean the unpaid principal of and interest on (including, without limitation, interest accruing after the maturity of the Revolving Loans) the Revolving Note and under this Agreement, or any other document made, delivered or given in connection therewith or herewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, or expenses.

"Permitted Encumbrances" means inchoate Liens for taxes, assessments or governmental charges or levies or Liens for taxes, assessments, governmental charges or levies not yet due or which are being contested in good faith by appropriate proceedings; *provided* that adequate reserves with respect thereto are maintained on the books of the Borrower and the lien of the Security Agreement.

"Person" shall mean an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, governmental authority or other entity of whatever nature.

"Petition Date" shall have the meaning ascribed thereto in the Recitals.

"Postpetition Financing Orders" shall mean the Interim Order and the Final Order.

"Reimbursement Date" shall have the meaning ascribed to it in Section 2.4.

5

"Reorganization Plan" shall mean a plan of reorganization or liquidation filed by the Borrower in the Chapter 11 Case.

"Requirement of Law" as to any Person shall mean the certificate of incorporation and bylaws or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other governmental authority, in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer" shall mean, as to any Person, the chairman of the board of directors, the chief executive officer, the president, the vice president of such Person or, with respect to financial matters, the chief financial officer, the treasurer, the assistant treasurer (if the assistant treasurer is an officer or serves in the capacity of the chief financial officer of such Person) or controller (if the controller is an officer or serves in the capacity of the chief financial officer of such Person) of such Person.

"Revolving Loan" shall have the meaning ascribed thereto in Section 2.1, as such Revolving Loans may be increased by interest and Fees capitalized and added to the principal balance thereto pursuant to the terms of this Agreement.

"Revolving Loan Commitment" means Lender's commitment to make Revolving Loans to the Borrower as set forth herein.

"Revolving Note" shall have the meaning ascribed thereto in Section 2.2.

"Security Agreement" shall mean that certain agreement entered into by and between Borrower and Lender, a form of which is attached hereto as "Exhibit B," which grants Lender a security interest in all assets of Borrower as security for repayment of the Loans.

"Senior Lien" shall mean a lien against all of the Borrower's assets, as more particularly described herein and in the Security Agreement, subject to existing and non-avoidable liens of creditors against the Borrower's assets.

"Subsidiary" or "Subsidiaries" of a Person shall mean a corporation, partnership or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the occurrence of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person. Unless otherwise indicated, all references to Subsidiaries are to the Subsidiaries of Borrower.

"Total Utilization of Revolving Loan Commitments" means, as of any date of determination, the sum of the aggregate principal amount of all outstanding Revolving Loans including interest and fees that are capitalized and added to the principal balance of the Revolving Loans pursuant to the terms of this Agreement.

6

"<u>V31 Secured Loan Debt</u>" shall mean the total amount owed by Borrower to V31-A&E LLC which is $163,604.29 as of the Petition Date, together with accrued, but unpaid, interest on and after May 29, 2014, and pre-petition and post-petition attorneys' fees, costs of collection, and other administrative and recovery expenses for which Borrower remains obligated.

1.2    <u>Other Definitional Provisions</u>.

(a)    Unless otherwise specified therein, all terms defined in this Agreement shall have their respective defined meanings when used in the Note or other document made or delivered pursuant hereto.

(b)    As used herein, in the Note or other document made or delivered pursuant hereto, accounting terms relating to either Borrower and accounting terms partly defined in <u>Section 1.1</u>, to the extent not defined, shall have the respective meanings given to them under normal and customary use.

(c)    The words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole, including all Exhibits, as the same may from time to time be amended, restated, modified or supplemented, and not to any particular section, subsection or clause contained in the Agreement or any such Exhibit.  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

(d)    Unless the context otherwise requires, each reference herein to any agreement, document or instrument (including the Loan Documents) shall be deemed a reference to such agreement, document or instrument as amended, restated, supplemented or otherwise modified from time to time.

(e)    The term "includes" and "including" shall not be construed to imply any limitation.

(f)    In this Agreement, in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including" and the words "to" and "until" each mean "to but excluding."  Periods of days referred to in this Agreement shall be counted in calendar days unless Business Days are expressly prescribed. Any period determined hereunder by reference to a month or months or year or years shall end on the day in the relevant calendar month in the relevant year, if applicable, immediately preceding the date numerically corresponding to the first day of such period, provided that if such period commences on the last day of a calendar month (or on a day for which there is no numerically corresponding day in the calendar month during which such period is to end), such period shall, unless otherwise expressly required by the other provisions of this Agreement, end on the last day of the calendar month.

1.3    <u>Payment Terms; References to Money</u>.

Except as expressly set forth herein to the contrary, (a) all payments made by the Borrower shall be made in Dollars in respect of principal and interest on the Revolving Loans,

and (b) to the extent not otherwise indicated, all amounts of money referenced herein shall mean and be references to amounts of money denominated in Dollars.

ARTICLE II
AMOUNT AND TERMS OF REVOLVING LOANS

2.1    Revolving Loan Commitments.

Subject to the terms and conditions hereof (including without limitation the conditions precedent set forth in ARTICLE IV hereof),

Lender agrees to make Revolving Loans (each, a "Revolving Loan") to Borrower from time to time until the Commitment Termination Date in an aggregate principal amount at any one time outstanding not to exceed the Borrowing Availability; provided that Lender shall not be permitted or required to make any Revolving Loan if:

(a)    after giving effect thereto, the sum of the outstanding aggregate principal amount of Revolving Loan would exceed Lender's Maximum Commitment Amount; or

(b)    after giving effect thereto, the aggregate outstanding principal amount of Revolving Loan outstanding would exceed the Borrowing Availability.

Until the Commitment Termination Date, the Borrower may from time to time borrow, prepay the Revolving Loans in whole or in part, and re-borrow under this Section 2.1, all in accordance with the terms and conditions hereof (subject in particular to any reductions in Revolving Loan Commitments pursuant to Sections 2.4) and in accordance with the Initial Budget.  Each Revolving Loan shall be denominated in Dollars.

2.2    Revolving Note.

The Revolving Loan made by Lender shall be evidenced by a promissory note of the Borrower made to the order of Lender substantially in the form of Exhibit A (a "Revolving Note"), with appropriate insertions as to date and principal amount, payable to the order of Lender and in a principal amount equal to the lesser of (a) the amount of the Revolving Loan Commitment and (b) the aggregate unpaid principal amount of all Revolving Loans made by Lender.  Each Revolving Note shall (i) be dated the Interim Closing Date, (ii) be stated to mature on the Maturity Date or such earlier date the Revolving Loans shall be due and payable in full, whether by acceleration or otherwise, pursuant to the terms of this Agreement and (iii) provide for the payment of interest.

2.3    Procedure for Revolving Loans and Payments.

(a)    The Borrower may borrow under the Revolving Loan Commitments until the Commitment Termination Date on any Business Day; provided that (i) the Borrower may not make more than one borrowing per calendar week and (ii) each borrowing under the Revolving Loan Commitment shall be in an amount equal to and not less than $50,000 or a whole multiple of $50,000 in excess thereof.  Prior to 2:00 p.m. Pacific Standard Time on the borrowing date

8

requested by the Borrower, Lender will make the amount of the Revolving Loan available to the account of the Borrower.

       (b)    The Revolving Loan (including all interest and fees capitalized and added to the principal balance of the Revolving Loan) shall be paid, in full, on the Commitment Termination Date, pursuant to the terms herein.  Lender's obligation to make Revolving Loans shall terminate at the close of business on the Business Day immediately preceding the Commitment Termination Date, unless sooner terminated in accordance with the terms hereof.

       2.4      <u>Permanent Reduction of Revolving Loan Commitment</u>.

       The Borrower shall have the right, upon not less than five Business Days' notice, to terminate the Revolving Loan Commitment or, from time to time, to reduce permanently the amount of the Revolving Loan Commitment in whole, but not in part.  Such reduction of the Revolving Loan Commitment shall be accompanied by payment in full of all outstanding principal and accrued interest thereon, to and including the date of such prepayment, together with any additional amounts owing and any outstanding fees and expenses due and owing.

       2.5      <u>Interest Rates and Payment Dates.</u>

       (a)    Each Revolving Loan (and all amounts capitalized and added to the principal balance of the Revolving Loans) shall bear interest (compounded monthly) at a rate *per annum* of six per cent (6.0%).

       (b)    Notwithstanding the foregoing, in the event an Event of Default has occurred and is continuing, the Revolving Loan shall bear interest at a rate *per annum* equal to the rate set forth above plus 4.0% from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived (after as well as before judgment).  In addition, should any interest on Revolving Loan or any other obligations payable hereunder not be paid when due (whether at the stated maturity, by acceleration or otherwise), such overdue amount shall bear interest (to the extent permitted by law in the case of interest on interest) at a rate *per annum* equal to rate set forth above <u>plus</u> 4.0%, in each case, from the date of such non-payment until such amount is paid in full (after as well as before judgment).

       (c)    Accrued interest on the Revolving Loan will be added to the outstanding principal balance of the Revolving Loan as of each Interest Payment Date without any obligation of Borrower to pay the same on the Interest Payment Date.  Amounts representing interest which is added to the outstanding principal balance of Revolving Loan, shall thereafter bear interest in accordance with this Section and otherwise be treated as a Revolving Loan for all purposes of this Agreement (except for purposes of determining the Total Utilization of Revolving Loan Commitments).  Interest accruing pursuant to <u>Section 2.5(b)</u> shall be payable from time to time on demand.

       2.6      <u>Computation of Interest</u>.

       (a)    Interest shall be calculated for the actual number of days elapsed on the basis of a hypothetical year of 360 days.

9

(b)     Each determination of an interest rate by Lender pursuant to any provision of this Agreement shall be conclusive and binding on the Borrower in the absence of manifest error

2.7    Prepayments.

(a)     Optional Prepayments.  Borrower may, at any time and from time to time prepay the Revolving Loans, in whole or in part, without premium or penalty, upon written notice to the Lender by 11:00 a.m. (Pacific Standard Time) on such date of prepayment, in each case, specifying the date and amount of prepayment.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with any amounts payable, accrued interest to such date on the amount prepaid and any outstanding fees and expenses then due and owing.

(b)     Mandatory Prepayments.

(i)     If at any time the Total Utilization of the Revolving Loan Commitments exceeds the Maximum Commitment Amount, Borrower shall repay the outstanding Revolving Loan to the extent required to eliminate such excess.

(ii)    In the event the acquisition of Borrower by Lender, pursuant to a purchase agreement (the "Purchase Agreement") between such parties, is not consummated, Borrower shall prepay on demand all Loans outstanding together with any other amounts due and payable hereunder.

(iii)   Borrower shall prepay all amounts as specified in Section 5.3.

2.8    Use of Proceeds.

The Borrower shall utilize the proceeds of the Revolving Loan solely (a) to indefeasibly pay in full the V31 Secured Loan Debt, in accordance with the Payoff Letter provided by V31-A&E LLC to the Borrower, (b) to fund operations consistent with the Initial Budget, (c) to fund the hiring and training of new pilots and (d) for payment of its allowed professional fees, as permitted by the Carve-Out.  Borrower shall not be permitted to use the proceeds of the Loans: (i) to finance in any way, any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to the interests of Lender or its rights and remedies under this Agreement, the other Loan Documents, the Interim Order or the Final Order, (ii) to finance the payment of, or application for authority to pay, any prepetition claim without the Lender's prior written consent, (iii) to make any distribution under a Reorganization Plan in any Chapter 11 Case, or (iv) to make any payment in settlement of any claim, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of Lender. The first proceeds of the Revolving Loan shall be used to indefeasibly pay in full the V31 Secured Loan Debt, in accordance with the Payoff Letter provided by V31-A&E LLC to the Borrower.

2.9    Separate Loans Not To Exceed Commitment.

All Loans to the Borrower and all of the other Obligations of Borrower arising under this Agreement and the other Loan Documents shall constitute separate loans to the Borrower,

10

evidenced by a separate promissory note executed by the Borrower; provided, however, that the Total Utilization of Revolving Loan Commitment shall not exceed the Maximum Commitment Amount.

2.10    Nature of Obligations.

Borrower hereby covenants, represents and warrants that, upon entry of the Interim Order (and the Final Order, as applicable), the Obligations of the Borrower hereunder and under the Loan Documents shall, pursuant to Section 364(c)(2) of the Bankruptcy Code, at all times constitute allowed secured claims in the Chapter 11 Case having priority over all secured or unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever; provided, however, the Vx Entities shall nonetheless be entitled to their grant of Section 507(b) protection as set forth in the Cash Collateral Order in the event that the adequate protection set forth in the Cash Collateral Order fails to satisfy such claims.  The Borrower further agrees to execute the Security Agreement which shall create the Lender's senior lien on all Borrower's assets effective upon entry of the Interim Order, subject to existing and non-avoidable liens of creditors against the Borrower's assets, consistent with the terms hereof.

2.11    Payment of Obligations.

Upon the Maturity Date (or such earlier date to the extent provided herein), the Lender shall be entitled to immediate payment of the Obligations then outstanding without further application to or order of the Bankruptcy Court.

2.12    No Discharge; Survival of Claims.

Borrower agrees that to the extent the Obligations are not satisfied in full, (i) its Obligations arising hereunder shall not be discharged by the entry of a order confirming a Reorganization Plan (and the Borrower pursuant to Section 1141(d)(4) of the Bankruptcy Code hereby waives any such discharge) and (ii) the secured lien granted to Lender pursuant to the Interim Order and Final Order shall not be affected in any manner by the entry of an order confirming a Reorganization Plan in any Chapter 11 Case.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

To induce Lender to make the Loans, the Borrower makes the following representations and warranties to Lender with respect to Borrower, each and all of which shall survive the execution and delivery of this Agreement.

3.1    Corporate Existence; Compliance with Law.

Borrower (a) is  duly organized, validly existing and in good standing under the laws of its jurisdiction of incorporation; (b) is duly qualified as a foreign corporation and is in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires such qualification, except where the failure to be so qualified could not reasonably be expected to have a Material Adverse Effect; (c) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has the

11

requisite corporate power and authority and the legal right to effect the transactions contemplated hereby and by the other Loan Documents to which it is a party; (d) subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, has the requisite corporate power and authority and the legal right to own, pledge, mortgage or otherwise encumber and operate its properties, to lease the property it operates under lease and to conduct its business as now, heretofore and proposed to be conducted; and (e) is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not reasonably be expected to have a Material Adverse Effect.

3.2    <u>Corporate Power, Authorization, Enforceable Obligations</u>.

Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), Borrower has the corporate power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and to authorize the execution, delivery and performance of the Loan Documents to which it is a party. Borrower has the appropriate power and authority to borrow hereunder and has taken all necessary corporate action to authorize the borrowings on the terms and conditions set forth in this Agreement and in the Note. Subject to the entry of the Interim Order and the Final Order, the Agreement has been, and each other Loan Document to which it is a party will be, duly executed and delivered on behalf of Borrower. Upon entry by the Bankruptcy Court of the Interim Order (or the Final Order, when applicable), this Agreement constitutes, and each other Loan Document to which Borrower is a party when executed and delivered will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the applicable Borrower in accordance with its terms (whether enforcement is sought by proceedings in equity or at law).

3.3    <u>No Legal Bar</u>.

Except for the effect of the filing of the Chapter 11 Case, the execution, delivery and performance of the Loan Documents to which Borrower is a party, the borrowings by each Borrower hereunder and the use of the proceeds thereof (a) will not violate any Requirement of Law or contractual obligation of Borrower, (b) will not accelerate or result in the acceleration of any payment obligations of Borrower, and (c) will not result in, or require, the creation or imposition of any Lien on any of the respective properties or revenues of any Borrower pursuant to any such Requirement of Law or Contractual Obligation, other than as set forth herein.

3.4    <u>No Material Litigation</u>.

No litigation, investigation or proceeding of or before any arbitrator or governmental authority (collectively, "<u>Litigation</u>") is pending or, to the knowledge of Borrower, threatened by or against Borrower (a) with respect to any of the Loan Documents or any of the transactions contemplated hereby or thereby, or (b) which could reasonably be expected to have a Material Adverse Effect.

3.5    <u>Taxes</u>.

Borrower has filed or caused to be filed all tax returns which, to the knowledge of the Borrower are required to be filed. Borrower has paid all taxes shown to be due and payable on said returns or on any assessments made against it or any of its property and all other taxes, fees

12

or other charges imposed on it or any of its property by any governmental authority (other than any tax, fee or other charge the amount or validity of which is currently being contested in good faith by appropriate proceedings and with respect to which reserves in conformity with customary usage has been provided on the books of such Borrower); and, no tax Lien has been filed, and, to the knowledge of Borrower, no claim is being asserted, with respect to any such tax, fee or other charge.

       3.6       <u>Purpose of Loans</u>.

The Borrower shall not use the proceeds of any Revolving Loan hereunder (a) other than in accordance with this Agreement.

       3.7       <u>Accuracy and Completeness of Information</u>.

All information, reports and other papers and data with respect to the Borrower (other than projections) furnished to the Lender by or on behalf of Borrower, were, at the time furnished, complete and correct in all material respects, or has been subsequently supplemented by other information, reports or other papers or data, to the extent necessary to give the Lender a true and accurate knowledge of the subject matter in all material respects. There is no fact known to any party which has, or could reasonably be expected to have, a Material Adverse Effect.

       3.8       <u>The Interim Order</u>.

On the date of the making of the initial Revolving Loan hereunder, the Interim Order shall have been entered and shall not have been stayed, amended (without the Lender's prior written consent, which consent shall not be unreasonably withheld), vacated, reversed, rescinded or otherwise modified in any respect. On the date of the making of any Revolving Loan, the Interim Order or the Final Order, as the case may be, shall have been entered and shall not has been amended, stayed, vacated or rescinded without the Lender's consent. Upon the maturity (whether by the acceleration or otherwise) of any of the Obligations of the Borrower hereunder and under the other Loan Documents, the Lender shall be entitled to immediate payment of such obligations, and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

       3.9       <u>Reorganization Matters</u>.

       (a)       The Chapter 11 Case was commenced on the Petition Date in accordance with applicable law and proper notice thereof and the proper notice for the hearing for the approval of the Interim Order has been given and proper notice for the hearing for the approval of the Final Order will be given.

       (b)       After the entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed secured claims in the Chapter 11 Case pursuant to 364(c)(2) of the Bankruptcy Code, having priority over all secured or unsecured claims against the Borrower now existing or hereafter arising, of any kind whatsoever; <u>provided, however</u>, the Vx Entities shall nonetheless be entitled to their grant of Section 507(b) protection as set forth in the Cash Collateral Order in the event that the adequate protection set forth in the Cash Collateral Order fails to satisfy such claims.

The Borrower further agrees to execute the Security Agreement which shall create the Lender's senior lien on all Borrower's assets effective upon entry of the Interim Order, subject to the existing liens of creditors against the Borrower's assets that are valid and non-avoidable.

(c)     Lender has the option of crediting the outstanding balance due under the Revolving Note to the purchase price offered for the Collateral under any Chapter 11 plan of reorganization presented to the Bankruptcy Court at such time.  If Lender is the successful buyer of the Collateral in any Asset Sale, after crediting the amount of such outstanding Revolving Note balance to the purchase price thereof, the Revolving Loans shall be deemed to have been paid in full by the Borrower and such Revolving Note shall be discharged as satisfied in full.

(d)     The Interim Order (with respect to the period prior to entry of the Final Order) or the Final Order (with respect to the period on and after entry of the Final Order), as the case may be, is in full force and effect has not been reversed, stayed, modified or amended.

(e)     Notwithstanding the provisions of Section 362 of the Bankruptcy Code, upon the Maturity Date, Lender shall be entitled to immediate payment of the Obligations and to enforce the remedies provided for hereunder, without further application to or order by the Bankruptcy Court.

## ARTICLE IV
## CONDITIONS PRECEDENT

4.1     <u>Conditions to the Initial Loans upon Entry of the Interim Order</u>.

The obligations of the Lender to make the initial Revolving Loans in an amount not to exceed the Maximum Commitment Amount on the Interim Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner satisfactory to the Lender, or waived in writing by the Lender:

(a)     <u>Loan Documents</u>.  The Lender shall have received this Agreement, the Revolving Note and all other Loan Documents, each other agreement, documents and instruments relating to the loan and other credit transactions contemplated by this Agreement, each duly executed where appropriate and in form and substance satisfactory to the Lender.

(b)     <u>No Material Adverse Effect</u>.  No Material Adverse Effect shall have occurred with respect to Borrower, other than those which customarily occur as a result of events leading up to and following the commencement of a proceeding under Chapter 11 of the Bankruptcy Code and the commencement of the Chapter 11 Case.

(c)     <u>Interim Order</u>.  Lender shall have received a copy of the Interim Order, <u>inter</u> <u>alia</u>, approving the transactions contemplated hereby and finding that the Lender is extending credit to the Borrower, in good faith, within the meaning of section 364(e) of the Bankruptcy Code.  Such Interim Order (i) shall be in form and substance satisfactory to Lender, (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to Lender, (iii) shall be in full force and effect and (iv) shall not have been stayed, reversed, vacated or rescinded or, without the consent of the Lender, modified or amended in any respect and, if the Interim Order is the subject of a pending appeal in any respect, neither the

making of such Loans nor the performance by the Borrower of any of its Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

(d)    Litigation.  No litigation shall have been commenced or remain active (meaning that such litigation has not been stayed by the commencement of the Chapter 11 Case) (i) which, if successful, would have a Material Adverse Effect on (1) Borrower taken as a whole or (2) its business or ability to repay the Revolving Loans or (ii) which would challenge this Agreement, Postpetition Financing Orders or the transaction contemplated thereby.

(e)    No Alternate Transaction.  No party (except for the Lender) shall be in discussions with Borrower in respect of any transaction relating to the acquisition of all or substantially all of the Collateral.

4.2    Conditions to Additional Loans upon Entry of the Final Order.

The obligations of the Lender to make the additional Revolving Loans in an amount not to exceed the Maximum Commitment Amount on the Final Closing Date, or to take, fulfill, or perform any other action hereunder, until the following conditions have been satisfied or provided for in a manner satisfactory to the Lender:

(a)    Conditions Set Forth in Section 4.1.  Each of the conditions precedent set forth in Section 4.1 shall be in full force and continuing effect.

(b)    Final Order.  Unless the Court orders otherwise, in no later than thirty (30) days after the Interim Closing Date, Lender shall have received a copy of the Final Order, inter alia, approving the transactions contemplated hereby and finding that the Lender is extending credit to the Borrower in good faith within the meaning of section 364(e) of the Bankruptcy Code.  Such Final Order (i) shall be in form and substance satisfactory to Lender, (ii) shall have been entered upon an application of the Borrower reasonably satisfactory in form and substance to the Lender, (iii) shall be in full force and effect and (iv) shall not has been stayed, reversed, vacated or rescinded or, without the consent of the Lender, modified or amended in any respect and, if the Final Order is the subject of a pending appeal in any respect, neither the making of such Loans nor the performance by the Borrower of any of its Obligations hereunder or under the Loan Documents or under any other instrument or agreement referred to herein shall be the subject of a presently effective stay pending appeal.

ARTICLE V
NEGATIVE COVENANTS

From the date hereof and for so long as the Revolving Loan Commitments remain in effect, any Revolving Note remains outstanding and unpaid or any Obligation is owing to the Lender hereunder, Borrower will not, (and will not apply, unless in connection with an amendment to the Agreement that is reasonably likely to be approved by the Lender to the Bankruptcy Court for authority to):

5.1    Limitation on Indebtedness.

15

Create, incur, assume or permit to exist any Indebtedness, or enter into any agreement or binding commitment to create, incur, assume or suffer to exist any Indebtedness, except the Revolving Loans and the other Obligations created under this Agreement.

5.2     Limitation on Liens.

Create, incur, assume or permit to exist any Lien on or with respect to its accounts or any of its other properties, assets or revenues, (whether now owned or hereafter acquired), except for the Permitted Encumbrances and the lien of any pre-Petition Date security interest in favor of any lessor or lender .

5.3     Limitation on Sale of Assets.

Convey, sell, lease, assign, transfer or otherwise dispose of any of its property, business or assets (including, without limitation, any receivables and fee or leasehold interests), whether now owned or hereafter acquired, in each case, in one transaction or a series of transactions to any Person, except:

(a)     as otherwise approved in writing prior to the consummation thereof by Lender; and

(b)     the sale or other disposition of obsolete or worn out property in the ordinary course of business and having a book value not exceeding $10,000 in the aggregate in any Fiscal Year, provided that the net proceeds of each transaction (if any) are applied in prepayment of the Revolving Loans.

Incur, create, assume, suffer to exist or permit any super priority  Lien which is pari passu with or senior to the claims of the Lender granted pursuant to this Agreement and the Postpetition Financing Orders except as provided herein.

ARTICLE VI
TERMINATION

6.1     Termination.

The financing arrangements contemplated hereby shall be in effect until the Commitment Termination Date, and the Loans and all other Obligations shall be automatically due and payable in full on such date.

6.2     Survival of Obligations Upon Termination of Financing Arrangements.

Except as otherwise expressly provided for in the Loan Documents, no termination or cancellation (regardless of cause or procedure) of any financing arrangement under this Agreement shall in any way affect or impair the obligations, duties and liabilities of the Borrower or the rights of Lender relating to any unpaid portion of the Loans or any other Obligations, due or not due, liquidated, contingent or unliquidated or any transaction or event occurring prior to such termination, or any transaction or event, the performance of which is required after the Commitment Termination Date.  Except as otherwise expressly provided

16

herein or in any other Loan Document, all undertakings, agreements, covenants, warranties and representations of or binding upon the Borrower, and all rights of Lender, all as contained in the Loan Documents, shall not terminate or expire, but rather shall survive any such termination or cancellation and shall continue in full force and effect until the Commitment Termination Date.

ARTICLE VII
EVENTS OF DEFAULT; RIGHTS AND REMEDIES

    7.1    Events of Default.

Notwithstanding the provisions of section 362 of the Bankruptcy Code and without application or motion to the Bankruptcy Court or any notice to Borrower, and subject to Section 7.2, the occurrence of any one or more of the following events (regardless of the reason therefor) shall constitute an "Event of Default" hereunder:

    (a)    (i) Borrower shall fail to pay any principal of any Revolving Note when due in accordance with the terms thereof or hereof or (ii) Borrower shall fail to pay any interest on any Revolving Note, any other Obligation or any other amount payable hereunder when any such interest or other amount becomes due in accordance with the terms thereof or hereof if, in either such case, such failure is not cured within ten (10) days of written notice from Lender; or

    (b)    One or more judgments or decrees shall be entered after the Petition Date against the Borrower involving in the aggregate a liability (to the extent not covered by third-party insurance as to which the insurer has acknowledged coverage) of $10,000 or more, net of insurance proceeds, and all such judgments or decrees shall not has been vacated, discharged, stayed or bonded pending appeal within 30 days from the entry thereof; or

    (c)    The occurrence of any additional "Event of Default" identified in the Interim Order (or, when applicable, analogous paragraph of the Final Order) not identified herein; or

    (d)    The occurrence of any of the following in the Chapter 11 Case:

    (i)    the dismissal of the Chapter 11 Case, or the conversion of the Chapter 11 Case from one under Chapter 11 to one under Chapter 7 of the Bankruptcy Code or Borrower shall file a motion or other pleading seeking the dismissal of the any of the Chapter 11 Case under section 1112 of the Bankruptcy Code or otherwise;

    (ii)    the appointment of an interim or permanent trustee in the Chapter 11 Case or the appointment of a receiver or an examiner in the Chapter 11 Case with expanded powers to operate or manage the financial affairs, the business, or reorganization of the Borrower (powers beyond those set forth under sections 1106(a)(3) and (4) of the Bankruptcy Code) under section 1106(b) of the Bankruptcy Code;

    (iii)    the entry of an order of competent jurisdiction (1) reversing, staying, vacating or rescinding either the Interim Order or the Final Order, or

17

either otherwise ceases to be in full force and effect (except in the case of the replacement of the Interim Order with the entry of the Final Order) or (2) amending, supplementing or otherwise modifying the Interim Order or the Final Order without the written consent of the Lender or the filing of a motion for reconsideration  in respect to the total Revolving Loan Commitments, without Lender's consent;

(iv)    Borrower materially violates or breaches the Postpetition Financing Orders or files any pleadings seeking, joining in, or otherwise consenting to any material violation or breach of the Postpetition Financing Orders;

(v)    the bringing of a motion, taking of any action or the filing of any Reorganization Plan or disclosure statement attendant thereto by the Borrower in the Chapter 11 Case:  (1) to obtain additional financing under section 364(c) or (d) of the Bankruptcy Code not otherwise permitted pursuant to this Agreement; (2) to grant any Lien other than Permitted Encumbrances upon or affecting any Collateral; or (3) any other action or actions adverse to Lender's rights and remedies hereunder;

(vi)    the entry of an order in the Chapter 11 Case granting any super priority administrative claim or Lien equal or superior to that granted to the Lender;

(vii)    the Final Order is not entered within 30 days following the expiration of the Interim Order, unless a continuance is ordered by the Court;

(viii)    the entry of an order in the Chapter 11 Case avoiding or requiring repayment of any portion of the payments made on account of the Obligations owing under this Agreement;

(ix)    the entry of an order in the Chapter 11 Case confirming a Reorganization Plan that does not contain a provision for termination of the Revolving Loan Commitments and repayment in full in cash of all of the Obligations under this Agreement on or before the effective date of such plan or plans;

(x)    the Bankruptcy Court shall enter an order or orders granting relief from or modifying the automatic stay applicable under Section 362 of the Bankruptcy Code to permit one or more creditors to execute upon, enforce or perfect a lien on any assets of the Borrower;

(xi)    Commencement of any suit against the Lender that would in any way reduce, set off, or subordinate the Obligations under this Agreement; if any such suit is commenced by any party other than the Borrower, and in the reasonable judgment of the Lender, such suit has a reasonable possibility of success, and if successful, would be reasonably likely to has a material adverse

18

effect on (1) the Borrower or (2) Borrower's business or their ability to repay the Revolving Loans made under this Agreement;

      (xii)    the payment of, or application for authority to pay, any prepetition claim without the Lender's prior written consent (which shall not be unreasonably withheld) or pursuant to an order of the Bankruptcy Court after notice and hearing unless otherwise permitted under this Agreement.

      (e)    <u>Change of Control.</u>  The occurrence of a Change of Control, unless otherwise agreed to by the Lender or the direct result of Lender's actions.

      (f)    <u>Change of Management.</u>  The occurrence of a Change of Management, unless otherwise agreed to by the Lender or the direct result of Lender's actions.

      (g)    <u>Default under the Purchase Agreement.</u>  The occurrence of any default or event of default (or like term) under the Purchase Agreement.

      7.2    <u>Remedies</u>.

Upon the occurrence and during the continuance of an Event of Default, and without further order of or application to the Bankruptcy Court, the Lender shall, by notice to the Borrower (with a copy to counsel for the Committee appointed in the Chapter 11 Case, and to the United States Trustee for the District of Nevada), take one or more of the following actions, at the same or different times: (i) terminate forthwith the Revolving Loan Commitments; (ii) declare the Loans or any portion thereof then outstanding to be forthwith due and payable, whereupon the principal of such Loans together with accrued interest thereon and any unpaid accrued Fees and all other liabilities of the Borrower accrued hereunder and under any other Loan Document, shall become forthwith due and payable, without presentment, demand, protest or any other notice of any kind, all of which are hereby expressly waived by the Borrower, anything contained herein or in any other Loan Document to the contrary notwithstanding; and (iii) take any other action or exercise any and all other rights or remedies under the Loan Documents, and under applicable law available to the Lender.

ARTICLE VIII<br>
MISCELLANEOUS

      8.1    <u>Amendments and Waivers</u>.

Neither this Agreement, any Revolving Note or any other Loan Document, nor any terms hereof or thereof may be amended, restated, supplemented or modified except in writing signed by each of the parties hereto.

      8.2    <u>No Waiver; Cumulative Remedies</u>.

No failure to exercise and no delay in exercising, on the part of Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a

19

waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

    8.3  <u>Survival of Representations and Warranties</u>.

   All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the Revolving Note and the making of the Loans hereunder.

    8.4  <u>Successors and Assigns; Participations and Assignments</u>.

    (a)  This Agreement shall be binding upon and inure to the benefit of the Borrower and the Lender and their respective successors and assigns, including any trustee appointed in this case.

    (b)  Lender may, in accordance with applicable law, sell or assign its rights under this Agreement and any Obligations of Borrower hereunder to any Person (each, an "<u>Assignee</u>"), subject to the terms and provisions of this Agreement, which shall be binding upon any such Assignee.  Lender or such Assignee shall give written notice to Borrower of any such transaction within five (5) days following the effective date thereof.

    (c)  The Borrower authorizes Lender to disclose to any Assignee and any prospective Assignee, any and all financial information in Lender's possession concerning the Borrower which has been delivered to Lender, subject to Lender's customary confidentiality and non-disclosure agreement and solely for the purpose of analyzing such Assignee's investment in the Loans.

    8.5  <u>Counterparts</u>.

   This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts (including by telecopy), and all said counterparts taken together shall be deemed to constitute one and the same instrument. A copy of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

    8.6  <u>Severability</u>.

   Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

    8.7  <u>Governing Law</u>.

THIS AGREEMENT AND THE REVOLVING NOTE AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT AND THE REVOLVING NOTE SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEVADA WITHOUT REGARD TO THE PRINCIPLES OF CONFLICT OF LAWS.

Submission to Jurisdiction; Waivers.    Borrower and Lender hereby irrevocably and unconditionally:

(a)    submit for themselves and their property in any legal action or proceeding relating to this Agreement and the other Loan Documents to which it is a party, or for recognition and enforcement of any judgment in respect thereof, to the jurisdiction of the Bankruptcy Court;

(b)    consent that any such action or proceeding may be brought in the Bankruptcy Court and waive any objection that they may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court and agree not to plead or claim the same;

(c)    agree that nothing contained herein shall affect the right to effect service of process in any other manner permitted by law or shall limit the right to sue in any other jurisdiction; and

(d)    waive, to the maximum extent not prohibited by law, any right they may have to claim or recover in any legal action or proceeding referred to in this Section any special, exemplary, punitive or consequential damages.

8.8    No Waiver.

No failure on the part of Lender to exercise, and no delay in exercising, any right, power or remedy hereunder or any of the other Loan Documents shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power or remedy preclude any other or further exercise thereof or the exercise of any other right, power or remedy. All remedies hereunder are cumulative and are not exclusive of any other remedies provided by law.

8.9    Waiver of Claims.

Upon the effectiveness of this Agreement, the Borrower shall be deemed to have (a) released and forever discharged Lender and its respective subsidiaries, agents, employees, officers, directors, managers, attorneys, affiliates, successors and assigns (collectively, the "Released Parties") of and from any and all liabilities, claims, obligations, indebtedness, liens, causes of action and rights of any kind, character or nature whatsoever, whether known or unknown, whether fixed or contingent, and whether liquidated or unliquidated, that the Borrower may have or claim to have against any such Released Party and which arises out of or is connected in any way with any action of commission or omission of the Borrower existing or occurring on or prior to the date of this Agreement, including without limitation any claims, liabilities or obligations relating to or arising out of or in connection with any of the transactions contemplated by any of the Loan Documents, from the beginning of time until the execution and

21

delivery of this Agreement (collectively, the "<u>Released Claims</u>") and (b) agrees forever to refrain from commencing, instituting or prosecuting any law suit, action or other proceeding against any of the Released Parties with respect to any of such Released Claims.

        8.10    Conflict.

      To the extent that there is a conflict between the terms and conditions of this Agreement, the Revolving Note, the Security Agreement, and the Postpetition Financing Orders, the terms and conditions of the Postpetition Financing Orders shall govern.

*     *     *     *

      IN WITNESS WHEREOF, the parties hereto has caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

TEM ENTERPRISES, a Nevada corporation dba
XTRA AIRWAYS, as Borrower

By: _____
    LISA DUNN, its President


AERLINE HOLDINGS LLC, a Delaware limited
liability company, as Lender

By: _____
    Name:
    Title:

23

# EXHIBIT A

# EXHIBIT A

$500,000.00                                                                    July_____, 2014

## REVOLVING PROMISSORY NOTE

This Revolving Promissory Note (this "Note") is given by TEM ENTERPRISES, a Nevada corporation dba XTRA Airways ("Borrower") in favor of Aerline Holdings LLC, a Delaware limited liability company ("Lender") to evidence such sums as Lender may hereafter loan and advance to Borrower from time to time, up to a maximum principal amount outstanding at any time of Five Hundred Thousand Dollars ($500,000.00)(the "Maximum Commitment Amount"), pursuant to that certain Debtor-in-Possession Revolving Agreement, dated as of the date hereof, by and between Lender and Borrower (the "Credit Agreement").

1.        Principal Obligation and Interest. FOR VALUE RECEIVED, Borrower unconditionally promises to pay to Lender such sums as Lender may hereafter loan and advance to Borrower from time to time, up to a maximum principal amount outstanding at any time in the amount of the Maximum Commitment Amount and until the Commitment Termination Date (as defined in and pursuant to the Credit Agreement. Payment shall be made to Lender at 121 Alhambra Plaza, Suite 1700, Coral Gables, Florida 33134, or at such other place as Lender may designate in writing, in currently available funds of the United States. Interest shall accrue and be payable on the outstanding principal balance due under this Note from time to time at the rate of six percent (6%) per annum (the "Interest Rate"). Interest shall be calculated from the date of each advance of principal under this Note until repayment of such principal, on the basis of the actual number of days elapsed and a 360-day year. All sums owing hereunder are payable in lawful money of the United States of America. Amounts borrowed hereunder may be repaid and re-borrowed as provided in the Credit Agreement. Advances under this Note may be requested by Borrower in accordance with the Credit Agreement.

2.        Maturity Date. The outstanding balance due under this Note, including accrued interest, fees capitalized and added to the unpaid principal pursuant to the Credit Agreement, and principal advances made under this Note and not previously repaid, shall be due and payable in full on the Commitment Termination Date (also referred to as the "Maturity Date"), subject to certain Mandatory Prepayment provisions set forth in the Credit Agreement. Otherwise, prepayment of this Note may be made at any time without premium or penalty. Interest shall accrue under this Note until the Maturity Date without any obligation of Borrower to make any installment or other payments of principal or interest under this Note until such time.

3.        Default and Acceleration. Borrower shall be in default under this Note (each, and "Event of Default") if: (i) Borrower fails to pay any amount as and when due and payable to Lender under this Note and such failure is not cured within ten (10) days of written notice from Lender; or (ii) upon the occurrence of any default by Borrower under the Credit Agreement, following any applicable notice and cure provisions set forth therein. If an Event of Default has occurred and is continuing, Lender, at its option and by written notice to Borrower, shall have the right to accelerate the Maturity Date and declare the entire outstanding balance due under this Note due and payable at such time. Such balance due shall bear interest at the Interest Rate set

1

311092

forth above plus one percent (1%) per annum (the "<u>Default Rate</u>") from the date of occurrence of such Event of Default until the date such Event of Default is cured or waived.

4.      <u>Security Agreement</u>.  The obligations of Borrower under this Note are secured by that certain Security Agreement of even date herewith given by Borrower, as Debtor, to Lender, as Secured Party (the "<u>Security Agreement</u>").  Upon the occurrence and during the continuance of an Event of Default hereunder, Lender shall have all rights and remedies of the Secured Party under the Security Agreement.

5.      <u>Miscellaneous</u>.

a.      The invalidity or unenforceability of any one or more provisions of this Note shall in no way affect the other provisions.

b.      All section headings used in this Note are intended solely for convenience and reference; said titles shall not affect any terms, provisions, or meanings of this Note.

c.      The laws of the State of Nevada shall govern the validity, construction, performance and effect of this Note.

d.      Any terms defined in the Credit Agreement and not otherwise defined herein are used herein with the meanings defined for those terms in the Credit Agreement.

IN WITNESS WHEREOF, this Note has been executed effective the date and place above written.

"Borrower"                                          "Lender"

TEM Enterprises, a Nevada corporation dba      Aerline Holdings LLC, a Delaware limited
XTRA Airways                                      liability company

By:_____      By:_____

Its:_____      Its:_____

311092

# EXHIBIT B

# EXHIBIT B

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Security Agreement") is made and entered into this ___ day of July, 2014, by and between TEM Enterprises, a Nevada corporation dba Xtra Airways ("Debtor") and AerLine Holdings LLC, a Delaware limited liability company ("Secured Party").

## RECITALS

A.    Debtor is indebted to Secured Party pursuant to that certain Debtor-in-Possession Revolving Credit Agreement of even date herewith (the "Credit Agreement"), with respect to financing provided by Secured Party in connection with that certain Chapter 11 bankruptcy proceeding styled *In re TEM Enterprises*, pending in the United States Bankruptcy Court, District of Nevada, Case No. 14-13955-abl.  Said indebtedness is evidenced by a Promissory Note given by Debtor, as Borrower, to Secured Party, as Lender, in a principal amount not to exceed $500,000.00 (the "Note").

B.    The parties desire to enter into this Security Agreement for the purpose of securing Debtor's obligations to Secured Party under the Note and Credit Agreement pursuant to the terms and conditions set forth below.

## AGREEMENT

**NOW THEREFORE**, in consideration of the above recitals and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    Creation of Security Interest.    Debtor hereby grants to Secured Party a first priority security interest in the Collateral defined in Paragraphs 3 and 4 hereof pursuant to the UCC (the "Security Interest").  The term "UCC" means the Uniform Commercial Code – Article 9 Secured Transactions, as enacted in the State of Nevada, and all regulations promulgated thereunder, and all revisions thereof or thereto.  Terms not otherwise defined in this Security Agreement shall have the meanings attributed to such terms in the UCC.

2.    Obligations Secured.    The Security Interest secures the following obligations of Debtor (the "Obligations"):

(a)    payment of any and all amounts due and payable by Debtor to Secured Party in connection with Debtor's obligations under the Note and Credit Agreement;

(b)    the necessary expenses and costs incurred or paid by Secured Party in the preservation, enforcement and realization of the rights of Secured Party under this Security Agreement;

(c)    performance of all obligations of Debtor under this Security Agreement.

1

3.     Description of Collateral.  The term "Collateral" means all Debtor's personal property assets, wherever located, and now owned or hereafter acquired, including, without limitation, accounts, chattel paper, inventory, collateral, instruments (including promissory notes), investment property, documents, deposit accounts, letter-of-credit rights, general intangibles (including payment intangibles), supporting obligations and, to the extent not listed above as original collateral, proceeds and products of the foregoing.

4.     Representations, Warranties and Agreements.  Debtor represents, warrants and agrees that:

(a)     Debtor has (or will have at the time it acquires rights in the Collateral hereafter arising) and will maintain so long as the Security Interest may remain outstanding, rights to the Collateral and all proceeds thereof, free and clear of all interests, liens, attachments, encumbrances and security interests except as Secured Party may otherwise agree in writing, and except that Debtor may replace the Collateral with items which are of like kind or better and of greater value.

(b)     Debtor will keep, preserve and maintain all tangible Collateral of material value in good repair, working order and condition, normal wear and tear and depreciation excepted.

(c)     Debtor will promptly pay all taxes and other governmental charges levied or assessed upon or against any Collateral or upon or against the creation, perfection or continuance of the Security Interest, except that Debtor may contest any taxes.

(d)     Debtor will, at reasonable times and upon written request of the Secured Party, permit Secured Party or its representatives to examine or inspect any Collateral, or any evidence of Collateral, wherever located.

(e)     Debtor will keep accurate books and records pertaining to the Collateral, and upon Secured Party's reasonable request, will permit Secured Party, or its employees, accountants, attorneys or agents, to examine and copy any or all of its records at reasonable times during Debtor's business hours.

(f)     Debtor will promptly notify Secured Party of any loss or material damage to any Collateral or of any substantial adverse change, known to Debtor, in any Collateral.  All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Secured Party as part of the Collateral.  If Secured Party consents to repair or replacement of any damaged or destroyed Collateral, Secured Party shall, upon satisfactory proof of expenditure, pay or reimburse Debtor from the proceeds for the reasonable cost of repair or restoration.  If Secured Party does not consent to repair or replacement of any of the Collateral, Secured Party shall retain a sufficient amount of the insurance proceeds to pay the balance due under the Note at such time, and shall pay the balance to Debtor.  Any insurance proceeds which have not been disbursed within three (3) months after their receipt and which Debtor has not committed to the repair or restoration of the Collateral shall be used to prepay the balance due under the Note at such time.

2

(g)     Debtor shall procure and maintain appropriate insurance, which may include without limitation damage, theft and liability coverage together with such other insurance as Secured Party may require with respect to all the Collateral, in form, amounts, coverage and basis reasonably acceptable to Secured Party and issued by a company or companies reasonably acceptable to Secured Party.  Debtor shall deliver to Secured Party copies of all such insurance policies or certificates of insurance in form satisfactory to Secured Party within thirty (30) days of execution of the Agreement, including stipulations that coverage will not be canceled or diminished without at least thirty (30) days' prior written notice to Secured Party.  In connection with all policies covering the Collateral, Debtor shall cause Secured Party to be named as an additional insured under all such policies, and will provide Secured Party with such loss payable or other endorsements as Secured Party may require.  If Debtor at any time fails to obtain or maintain any insurance as required under this Security Agreement, Secured Party may (but shall not be obligated to) obtain such insurance as Secured Party deems appropriate, which will cover only Secured Party's interest in the Collateral, and may add the premiums for such insurance to the principal balance of the Agreement.

(h)     Debtor, from time to time, will execute and deliver or endorse any and all instruments, documents, conveyances, assignments, security agreements, financing statements and other agreements and writings which the Secured Party may reasonably request in order to secure, protect, perfect or enforce the Security Interests or the rights of the Secured Party under this Security Agreement (but any failure to request or assure that Debtor executes, delivers or endorses any such item shall not affect or impair the validity, sufficiency or enforceability of this Security Agreement and the Security Interests, regardless of whether any such item was or was not executed, delivered or endorsed in a similar context or on a prior occasion).  Secured Party shall have the right to file any financing statement, continuation statement, or amendment to any financial statement in connection therewith without the consent or approval of Debtor.  Debtor shall take, or assist Secured Party in taking, whatever additional steps necessary or reasonably requested by Secured Party to identify Secured Party as a lienholder on any certificates of ownership or other applicable documents of title to the Collateral.  Secured Party shall have the right to retain all certificates of ownership or other applicable documents of title to the Collateral until the Amount is paid in full and Secured Party's security interest in the Collateral is released.

(i)     Debtor will perform, comply with and abide by all laws, ordinances, rules, regulations and orders of governmental authorities now or hereafter affecting the Collateral.

If Debtor at any time fails to perform or observe any of the foregoing agreements and such failure is not cured within fifteen (15) days of written notice from Secured Party, Secured Party may, but need not, perform or observe such agreements on behalf and in the name, place and stead of Debtor (or, at the Secured Party's option, in the Secured Party's name) and may, but need not, take any and all other actions which the Secured Party may reasonably deem necessary to cure or correct such failure (including, without limitation, the payment of taxes, the procurement and maintenance of insurance, the execution of assignments, security agreements and financing statements, and the endorsement of instruments); and Debtor shall thereupon pay to Secured Party within fifteen (15) days of written demand the documented amount of all monies reasonably expended and all costs and expenses reasonably incurred by Secured Party

3

(including reasonable attorneys' fees and legal expenses) in connection with or as a result of the performance or observance of such agreements or the taking of such action by the Secured Party, together with interest thereon from the date expended or incurred at the default rate of interest as provided in the Note.

5.    Debtor's Right to Possession.  So long as no Event of Default has occurred and is continuing, Debtor shall have the exclusive right of possession and use of the Collateral.

6.    Protection of Secured Party's Interest.  If Debtor fails to perform the covenants and agreements contained herein and if such failure is not cured within fifteen (15) days following written notice from Secured Party, or if any action or proceeding is commenced which affects the Collateral or title thereto, or the interest of Secured Party therein, then Secured Party, at Secured Party's option, may make such appearances, disburse such sums, and take such action as Secured Party deems necessary, in its reasonable discretion, to protect its interest in the Collateral.  Any reasonable amounts disbursed by Secured Party pursuant to this Paragraph, with interest thereon, shall become additional indebtedness of Debtor secured by this Security Agreement.  Unless Debtor and Secured Party agree in writing to other terms of payment, such amounts shall be due and payable within fifteen (15) days of written notice to Debtor setting forth the documented amount thereof.  Nothing contained in this Paragraph shall require Secured Party to incur any expense or take any action.

7.    UCC Financing Statements.  Debtor authorizes Secured Party to file any financing statement, continuation statement or other instrument or document necessary or, in the opinion of Secured Party, advisable to perfect the Security Interest created by this Security Agreement. From time to time, Debtor shall promptly execute and deliver all further instruments and documents, and take all further action, that may be reasonably necessary or that Secured Party may reasonably request in order to perfect and protect any security interest granted or purported to be granted hereby.

8.    Books and Records.  Debtor shall keep, and maintain at its principal place of business, accurate books and records pertaining to the Collateral or its proceeds. Debtor shall, from time to time promptly upon request of Secured Party, make such books and records available for inspection and copying by Secured Party during normal business hours.

9.    Events of Default.  Each of the following is an Event of Default under this Security Agreement: (i) an Event of Default under the Note or Credit Agreement following any applicable notice and cure provisions set forth therein; or (ii) any failure by Debtor to comply with any material terms or conditions of this Security Agreement after receipt of written notice and a reasonable opportunity to cure (but not less than fifteen (15) days, in any case).

10.    Remedies.  Upon the occurrence and during the continuance of an Event of Default, Secured Party may, after giving written notice of such Event of Default to Debtor, exercise one or more of the following rights and remedies: (i) exercise and enforce any and all rights and remedies under the Note, the Credit Agreement and/or this Security Agreement; (ii) exercise and enforce any and all rights and remedies available upon default to a secured party under the UCC, including without limitation, the right to take possession of Collateral, or any

4

evidence thereof, proceeding without judicial process or by judicial process and the right to sell at a private sale or public auction, or otherwise dispose of any or all of the Collateral, and in connection therewith Debtor will on demand assemble the Collateral and make it available to Secured Party at a place to be designated by Secured Party which is reasonably convenient to both parties, and Secured Party shall have the right to take immediate possession of said Collateral and may enter the premises of Debtor or wherever said Collateral is located, and shall have the right to keep and store the same on said premises until sold.  If notice to Debtor of any intended disposition of Collateral or any other intended action is required by law in a particular instance, the timing of such notice shall be deemed commercially reasonable if given (in the manner specified in Paragraph 13) at least thirty (30) calendar days prior to the date of intended disposition or other action; (iii) without notice or demand, offset any indebtedness Secured Party then owes to Debtor, whether or not then due, against any obligation then owed to Secured Party by Debtor, whether or not then due; (iv) exercise or enforce any and all other rights or remedies available by law or agreement against the Collateral, against Debtor, or against any other person or property; and (v) accelerate the indebtedness under the Note and declare the entire principal balance under the Note Loans immediately due and payable and require immediate payment thereof by Debtor.

        11.    <u>Non-Waiver</u>.  This Security Agreement cannot be waived, modified, amended, terminated or discharged, and the Security Interests cannot be released, except when given in writing signed by Secured Party.  A waiver so signed shall be effective only in the specific instance and for the specific purpose given.  Mere delay or failure to act shall not preclude the exercise or enforcement of any rights and remedies available to Secured Party.

        12.    <u>Rights Cumulative</u>.  All rights and remedies of Secured Party shall be cumulative and may be exercised singularly in any order or sequence, or concurrently, at Secured Party's option, and the exercise or enforcement of any such right or remedy shall neither be a condition to nor bar the exercise or enforcement of any other.

        13.    <u>Notices</u>.  All notices to be given to Debtor shall be deemed sufficiently given if delivered or mailed by registered, certified or ordinary mail, postage pre-paid, to Debtor at its address set forth below or at its most recent address shown on the Secured Party's records, with a copy to its counsel via mail, postage pre-paid and email as follows:

<u>Debtor</u>:                                 <u>With Copy to</u>:

TEM Enterprises d/b/a Xtra Airways        McDonald Carano Wilson LLP
Attn: Lisa Dunn                            c/o Ryan J. Works, Esq.
805 West Idaho Street                      2300 W. Sahara Avenue, Suite 1200
Boise, Idaho 83702                         Las Vegas, NV 89102

        14.    <u>Expenses</u>.  Debtor shall pay to Secured Party on demand any and all reasonable attorneys' fees and other expenses incurred by Secured Party in connection with the enforcement of this Security Agreement and, if Secured Party is the prevailing party in any action to enforce this Security Agreement, reasonable attorneys' fees and expenses which may be expended by Secured Party to obtain or enforce payment as against Debtor in such action.  If Debtor is the

prevailing party in any such action, Secured Party shall pay its reasonable attorneys' fees and expense. All expenses of Secured Party relating to the disposition of the Collateral following an Event of Default, including without limitation the expenses of retaking, holding, insuring, repairing for sale and selling the Collateral, shall become a part of the indebtedness secured by this Security Agreement and shall be payable on demand.

15.    Miscellaneous. This Security Agreement shall be binding upon and shall inure to the benefit of the parties' respective successors and assigns. This Security Agreement shall be governed by the laws of the State of Nevada. If any provision or application of this Security Agreement is held unlawful or unenforceable in any respect, such illegality or unenforceability shall not affect other provisions or applications which can be given effect, and this Security Agreement shall be construed as if the unlawful or unenforceable provision or application had never been contained herein or prescribed hereby. Debtor waives notice of the acceptance of this Security Agreement by the Secured Party.

16.    Construction. The terms and conditions of this Security Agreement shall be construed as a whole according to their fair meaning and not strictly for or against any party. The parties acknowledge that each of them has reviewed this Security Agreement and has had the opportunity of having their attorneys review this Security Agreement. The normal rule of construction to the effect that any ambiguities are to be resolved against the drafting party shall not be employed in the interpretation of this Security Agreement or of any of its schedules, exhibits or amendments.

17.    Counterparts. This Security Agreement may be executed in any number of counterparts and each such counterpart shall for all purposes be deemed an original, and all such counterparts shall together constitute but one and the same instrument. Any signature page of this Security Agreement may be detached from any counterpart without impairing the legal effect of any signatures, and may be attached to another counterpart, identical in form, but having attached to it one or more additional signature pages. This Security Agreement may be executed by signatures provided by electronic transmission, which signatures shall be as binding and effective as original signatures.

IN WITNESS WHEREOF, the undersigned has executed this Security Agreement as of the date first set forth above.

Debtor:                                             Secured Party:

TEM ENTERPRISES, a Nevada corporation        AERLINE HOLDINGS LLC, a Delaware
dba XTRA AIRWAYS                              limited liability company

By:_____        By:_____
    Lisa Dunn, its President                  Its:_____

6

# EXHIBIT 3

# EXHIBIT 3

**TEM Enterprises, Inc.**
**Cash Budget**
**Through September 30, 2014**

Budget

| | Jul-14 | Aug-14 | Sep-14 |
|---|---|---|---|
| Beginning cash balance | 606,339 | 343,278 | 368,085 |
| Cash from operating revenues | 1,414,357 | 1,463,236 | 1,463,236 |
| Expenditures | | | |
| Aircraft maintainence reserves ($90,000 payable to Triton) | 126,182 | 130,000 | 220,000 |
| Aircraft lease payments ($105,00 to Triton and $50,000 (2) to AerLine) | - | 205,000 | 205,000 |
| Engine Leases (Use Charges payable to VX Entities) | 49,399 | 26,866 | 26,866 |
| Engine Maintenance Reserves (Additional Use Charges payable to VX Entities)[1] | 150,000 | 80,000 | 80,000 |
| Chilean Customs (VX Entities) | 4,259 | - | - |
| Contract Maintenance | 35,315 | 30,000 | 30,000 |
| Rents | 13,152 | 15,000 | 15,000 |
| Utilities/Phones | 5,290 | 6,000 | 6,000 |
| Fuel (VX Entities) | 20,000 | 20,000 | |
| Fuel, other | 140,946 | - | - |
| Parts | 54,746 | 45,000 | 45,000 |
| Wheels/Brakes | 25,795 | 34,500 | 34,500 |
| Crew Travel | 23,604 | 25,000 | 25,000 |
| Taxes & Fees | 10,000 | 10,000 | 10,000 |
| Attorney Fees | 18,135 | 30,000 | 30,000 |
| Payroll | 520,596 | 580,000 | 580,000 |
| Workers Comp | - | - | - |
| Aviation insurance | 180,000 | 135,000 | 135,000 |
| Employee health insurance | 30,000 | 30,000 | 30,000 |
| TSA 9/11 taxes | 70,806 | 12,765 | 12,765 |
| Federal excise taxes | 4,298 | 4,298 | 4,298 |
| Mexico overflight permits | 294 | 4,000 | 4,000 |
| Trustee fees | 10,400 | - | - |
| Other | 184,201 | 15,000 | 20,000 |
| Total expenditures | 1,677,418 | 1,438,428 | 1,513,428 |
| Net cash flow | (263,061) | 24,807 | (50,193) |
| Ending cash balance | 343,278 | 368,085 | 317,892 |
| | - | - | |

[1]The amount due for July includes an $80,000 "catch up" payment from June. One half of the June payment ($40,000) shall be tendered on or before July 15, 2014, while the other half ($40,000) will be due on or before July 31, 2014

# EXHIBIT 4

# EXHIBIT 4

July 16, 2014

**Via .pdf and U.S. Mail**

TEM Enterprises dba Xtra Airways (the "**Company**")
805 W. Idaho St., Suite 400
Boise, Idaho 83702
Attention: Lisa Dunn, President

> Re: Request of the Company for payoff of all obligations under the Secured Promissory Note in the original principal amount of $602,619.00, dated August 10, 2011, and that certain Engine Mortgage and Security Agreement (ESN 726312), by and between the Company and V31-A&E LLC (the "**Lender**"), as amended by that certain Security Agreement (ESN 726312) Supplement No. 1, dated August 10, 2011 (as amended, the "**Security Agreement**") (collectively, the "**Credit Agreement**");
>
> In re: TEM Enterprises, Debtor; Case No. 14-13955-abl -in the United States Bankruptcy Court for the District of Nevada (the "**Bankruptcy Court**")

Dear Ms. Dunn:

You have requested that the Lender accept payment in full of all obligations of the Company under the Credit Agreement as of July 16, 2014 (the "**Payoff Date**"), and terminate the Lender's security interests in the Company's Collateral, as more fully described in that certain Stipulation and Agreed Order Authorizing Debtor to Use Cash Collateral and Granting Adequate Protection Pursuant to 11 U.S.C. §§ 361 and 363, entered by the Bankruptcy Court on July 2, 2014. Capitalized terms not otherwise defined in this letter shall have the meanings set forth in the Cash Collateral Order.

## CONDITIONS TO TERMINATION OF CREDIT AGREEMENT AND SECURITY INTEREST

In order to meet your request, the Lender must receive all of the following no later than 11:00 a.m., local San Francisco, California, time on the Payoff Date:

(i)    immediately available funds in the amount of $242,762.38 (together with interest per diem at the rate of $65.13 after the Payoff Date, the "**Payoff Amount**"), representing all unpaid principal, interest, fees, costs and expenses under the Credit Agreement, as fully set forth on attached Schedule A;

(ii)     a fully executed counterpart to this letter;

(iii)     a motion and order of the Bankruptcy Court approving the execution and delivery of the Payoff Letter and payment of the Payoff Amount to the Lender, in form and substance acceptable to the Lender; and

(iv)     a Release and Indemnity Agreement in the form attached hereto as <u>Exhibit A</u> duly executed by the Company.

**TERMINATION OF CREDIT AGREEMENT AND SECURITY INTEREST**

Upon timely receipt of the foregoing (including timely receipt of interest per diem of $65.13 after the Payoff Date),

1.     The Lender shall release, terminate and satisfy its security interest in the Company's Collateral and execute and deliver such releases, termination statements or directions to terminate as the Company may reasonably request, which must be prepared and filed by the Company at the Company's sole cost and expense.

2.     The Company is authorized by the Lender to file UCC termination statements to terminate the Lender's security interest in the Company's personal property Collateral**.**

3.     The Credit Agreement shall be terminated and the obligations of each party thereunder shall cease to be of any further force or effect; <u>provided, however</u>, that all provisions of the Credit Agreement which by their terms survive termination of the Credit Agreement including, without limitation, the Company's obligation to repay all indebtedness under the Credit Agreement and the Company's obligation to pay the Lender's continuing costs and expenses and to indemnify and hold the Lender harmless, shall survive and not be deemed terminated, but shall remain in full force and effect.

Further, upon receipt of the Payoff Amount and any applicable per diem amount and of the release and indemnification of the Lender provided for hereunder, the Lender hereby releases (i) Company from its obligations under the Credit Agreement.  Nothing herein discharges the Company from its liabilities under this letter, or the Credit Agreement which survive the payoff of the obligations under the Credit Agreement.  Nothing herein discharges the Company from any of its obligations, liabilities, representations, or warranties made in the Release and Indemnification of even date herewith.

**PAYMENT OF PAYOFF AMOUNTS AND ADJUSTMENTS**

The Payoff Amount should be sent via wire transfer to the Lender as follows:

> Credit Bank: Citibank N.A.
> 451 Montgomery Street
> San Francisco, CA 94104
> ABA #: 321171184
> SWIFT Code: CITI US 33
> Account Number: 203586623

Account Name: V31-A&E LLC
Account Address: 915 Front Street, San Francisco, CA 94111

In the event that Lender does not receive the Payoff Amount in immediately available funds at or prior to 11:00 a.m. local San Francisco, California, time on the Payoff Date, an additional per diem charge of $65.13 will be added to the Payoff Amount.  The Payoff Amount is subject to adjustment in the event that any checks, instruments, and payment orders deposited to any of Company's accounts are returned for insufficient funds or have not been processed or because of errors in computation or other clerical or computer errors, or for any other reason.

It is understood and agreed that our cancellation and termination of the Credit Agreement, and the security interest of the Lender in the Collateral of the Company, is being undertaken in consideration of and in reliance upon the agreement of the Company to indemnify the Lender as provided in this letter and as provided in the Release and Indemnity Agreement required to be delivered hereunder.

This letter and the Release and Indemnification may be executed in several counterparts (and by each party on a separate counterpart), each of which when so executed and delivered shall be an original, but all of which together shall constitute one agreement.  Delivery of an executed counterpart of this letter or the Release and Indemnification by facsimile or other electronic transmission shall have the same force and effect as the delivery of an original executed counterpart of such agreements.  Any party delivering an executed counterpart of such agreements by facsimile or other electronic transmission shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability or binding effect of such agreements.

If the Payoff Amount is not received by the Lender on or before 11 a.m. local San Francisco, California, time on August 5, 2014, this letter shall terminate and be of no further force or effect without further action by the Lender or any other party.

Thank you.  If you have any questions, please call.

[Remainder of Page Intentionally Blank]

Very truly yours,

**V31-A&E LLC**

By:    V31 Investors LLC,
          its Manager

By:    Vx Holdings, Inc.
          its Manager


By:_____
Name: _____
Title: _____


**ACKNOWLEDGED AND AGREED TO:**

TEM Enterprises dba Xtra Airways


By:_____
Name: _____
Title: _____

## SCHEDULE A

### Calculation of Payoff Amount

Principal and Default Interest as of July 16, 2014:        $166,339.71

Additional Per Diem Interest:        $65.13

Lender's Attorneys' Fees:

    a.  K&L Gates LLP June 2014 Invoice (May time)    $15,739.67

    b.  K&L Gates LLP July 2014 Invoice (June time)    $43,483.00

    c.  Snell & Wilmer LLP July 2014 Invoice (June time)    $7,500.00

    d.  Additional K&L Gates LLP time (July)    $9,700.00

                        PAYOFF AMOUNT    $242,762.38

# RELEASE AND INDEMNIFICATION
### (Company)

The undersigned, TEM Enterprises dba Xtra Airways (the "Company"), in consideration of the mutual obligations of the parties in that certain pay-off letter (the "Pay-Off Letter"), dated, July 16, 2014, by and between the Company and V31-A&E LLC (the "Lender"):

(a)       hereby releases and forever discharges the Lender, its participants, and each of their respective current, former, or future affiliates, officers, agents, directors, members, partners, managers, representatives, directors, shareholders, employees, and attorneys and each of their respective predecessors in interest (collectively with Lender, the "Lender Group") of, to, and from any claim, demand or cause of action to which the Company is, or at any time in the future becomes, entitled to against the Lender Group, or any member thereof, arising out of or in any way related to the Credit Agreement (as defined in the Pay-Off Letter) or the transactions thereunder; provided, however, nothing herein shall constitute a release of claims, demands, or causes of action to which the Company becomes entitled to against the Lender for any breach of the agreements of the Lender existing under the Pay-Off Letter; and

(b)       acknowledges that the amounts referred to in Schedule A to the Pay-Off Letter are due and owing pursuant to the provisions of the Credit Agreement, and confirms its agreement to the terms and provisions of the Pay-Off Letter.

TEM Enterprises dba Xtra Airways

By: _____

Name: _____

Title: _____

**RELEASE AND INDEMNIFICATION** – Page 1

DA-3342789 v7 1204510-00004

# EXHIBIT 5

FILED UNDER SEAL

FILED UNDER SEAL

# EXHIBIT 5

# EXHIBIT 6

FILED UNDER SEAL

FILED UNDER SEAL

# EXHIBIT 6